# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

WES SMITH & JERRY M. MILLS, JR.,
D/B/A WFSS FARMS;
CECIL W. BENTON, INDIVIDUALLY;
STEVEN DIXON, INDIVIDUALLY;
STEVEN DIXON, LLC;
CARL HIERS, INDIVIDUALLY;
LL "BUDDY" HIERS, INDIVIDUALLY;
JERRY M. MILLS, JR., INDIVIDUALLY;
AMY NORMAN, INDIVIDUALLY;
MATT HIERS, INDIVIDUALLY;
RONALD D. CANNON, INDIVIDUALLY; AND
JESSE D. STRICKLAND, D/B/A J&J FARMS,

       *Plaintiffs*,

v.                        CASE NO. 1:15CV118-MW/GRJ

POLY EXPERT, INC.,
A FOREIGN CORPORATION; AND
WILLOW RIDGE PLASTICS, INC.,
A KENTUCKY CORPORATION,

       *Defendants.*

_____/

## ORDER GRANTING MOTIONS TO DISMISS

Plaintiffs, a number of North Florida farmers, claim that their watermelon crops were damaged when plastic mulch manufactured by Defendant Poly Expert, Inc. degraded prematurely.

ECF No. 61, at 6 ¶¶ 18–21. It turns out that the premature degra-
dation may have been caused in part by an additive made by De-
fendant Willow Ridge Plastics, Inc. *Id.* at 11–13 ¶¶ 45–46.

Plaintiffs ("Farmers") seek damages from Poly Expert and
Willow Ridge under a number of different legal theories—breach
of warranty, strict liability, etc. *See id.* Poly Expert has filed a
third-party complaint / cross-claim against Willow Ridge claiming
that Willow Ridge is liable to it for any injuries caused by the al-
legedly defective additive. ECF No. 75, at 20. Willow Ridge moved
to dismiss both the Farmers' claims against it and Poly Expert's
cross-claims against it for lack of personal jurisdiction. ECF Nos.
32, 40, & 68. This Order grants Willow Ridge's motions.

I

Under Federal Rule of Civil Procedure 12(b)(2), defendants
may move to dismiss an action for lack of personal jurisdiction. The
plaintiff bears the initial burden of alleging sufficient facts in the
complaint to make a prime facie case for personal jurisdiction over
a nonresident defendant. *See Meier ex rel. Meier v. Sun Intern. Ho-
tels, Inc.*, 288 F.3d 1264, 1268–69 (11th Cir. 2002). If the defendant
submits affidavits or other evidence to contest jurisdiction, the
burden shifts back to the plaintiff to produce evidence supporting

jurisdiction. *Id.* at 1269. When the supporting evidence provided by the plaintiff and defendant conflict, all reasonable inferences must be construed in favor of the plaintiff. *Id.*

Accompanying its first motion to dismiss, Willow Ridge submitted the affidavit of Nadina Dennie, the Vice President and General Manager of Willow Ridge. ECF No. 32, at 19. The parties were subsequently permitted to conduct jurisdictional discovery. *See* ECF. No. 37. The record is now complete enough to allow this Court to rule on the jurisdictional question.

## II

### A

Plaintiffs are residents of Florida. ECF No. 61, at 2. Poly Expert is a Canadian corporation.[1] Poly Expert manufactured the plastic mulch that allegedly degraded and sold it to a Delaware distributor, which then sold it to a Florida retailer.[2] *Id.* at 4–5.

Poly Expert claims that Willow Ridge is liable for any damage to the watermelon crops because any premature degradation of the mulch was caused by a new additive Poly Expert purchased

---

[1] Poly Expert does not contest personal jurisdiction.

[2] The distributor, Vincent Farms, and the retailer, Williston Farm Supplies & Services, are not named as defendants.

from Willow Ridge and incorporated into the mulch. ECF No. 10, at 12. Poly Expert purchased this new additive from Willow Ridge based on assurances that the effects of the new additive on the plastic mulch would be the same as the effects of the old additive. *See id.* at 11–13, 15; *see also* ECF No. 29, Ex. 2.

## B

Willow Ridge is a Kentucky corporation with its principal place of business in Kentucky. ECF No. 32, at 2. Willow Ridge is not registered with the Florida Department of State and does not have employees or salespeople here. *Id.* at 19. When asked how most customers find out about Willow Ridge, Dennie answered "searching the web." ECF. No 45-2, at 25.

Examples of where Willow Ridge has sold its additives in the United States include the states of Missouri, North Carolina, California, North Dakota, and Tennessee. ECF No. 45-1, at 27. While Willow Ridge does not have any distributors in Florida, one of its distributors, "Colors for Plastics," located in Illinois, is described on Willow Ridge's website as covering the "southeast" of the United States. ECF No. 45, Ex. 1. at 8. However, when asked if Florida

customers would use Colors for Plastics as their distributor, Dennie answered that Florida customers would purchase directly from Willow Ridge. ECF No. 45-2, at 22.[3]

Willow Ridge states on its website that the company's goal is "to make Willow Ridge Plastics' ecologically friendly degradable plastic products the global standard." ECF No. 45, Ex. 1 at 8. In her deposition, Dennie explained that Willow Ridge's "products are made to be added to plastic to make them degrade." ECF No. 45-2, at 6, 9. When asked, "do you have any reason to dispute that a customer buying the Poly Expert mulch expecting [it] to degrade is making use of whatever component is in that product that causes it to degrade," Dennie responded "correct if it's made right." ECF No. 45-4, at 29. Dennie also conceded that the additive used by the Farmers was having an effect on their fields. *Id.* at 30.

While Willow Ridge lacks a physical presence in Florida, there is evidence that Willow Ridge has had some business con-

---

[3] When asked again about whether the "southeast" includes Florida, Dennie responded "I don't think so" and that she thought Colors for Plastics' reach only went as far south as Georgia. ECF No 45-5, at 23. Dennie suggested there might be some limitation in the distribution agreement. *See id.* The distribution agreement is not in the record.

tacts with Florida. For example, Willow Ridge has at least one customer who has a residence address in Florida. *See* ECF No. 45-5, at 5; *see also* ECF 45, Ex. 5-B. While the individual that contacts Willow Ridge on behalf of the company is located in North Carolina and the product itself is shipped to North Carolina, invoices for sales are sent to Florida. *See* ECF No. 45-5, at 5.

In addition, Dennie testified that Willow Ridge's Venezuelan distributor uses a broker in Florida to come and pick up shipments from Willow Ridge. *See Id.* at 8–9. Invoices are then sent directly to the broker located in Miami, Florida. *See* ECF. No 45, Ex. 5-B. Once the Florida broker picks up the product, it is then sent overseas from Florida. *See* ECF No. 45-5, at 9.[4]

C

Poly Expert and Willow Ridge's business relationship began in 1997. *See* ECF No. 45-1, at 10–11. Faxes and emails between the two entities show that in addition to selling additives to Poly Expert, Willow Ridge provided recommendations on how best to use their additives. For example, in January of 1998, William C.

---

[4] In addition, one Willow Ridge employee attended a trade show in Orlando in 2012 and an ATSM conference in Jacksonville in 2013. ECF No. 45, Ex. 6. However, Willow Ridge did not have a "booth or anything," and little appears to be known as to why a Willow Ridge employee attended the shows. ECF. No. 45-4, at 22.

Hogan (on behalf of Willow Ridge) faxed Poly Expert the recommended usage of Willow Ridge's UV-H additive to mulch film to be used in the state of Georgia. ECF No. 45, Ex. 8.

Willow Ridge first tested Poly Expert's plastic mulch in either 1997 or 1998. ECF No. 45-1, at 18. The most recent testing of Poly Expert's product took place when Poly Expert sent Willow Ridge samples of its plastic mulch used in Florida following the Farmers' complaints. *See* ECF No. 45-4, at 26–27. Upon receiving these samples, Willow Ridge was aware the samples came from Florida. *Id.* Willow Ridge also does not dispute that the mulch used by the Farmers contained the PDQ-M additive manufactured by Willow Ridge. *Id.* at 27.

Dennie stated in her deposition that Willow Ridge "do[es]n't normally go by region or specific area" when testing products for customers. ECF No. 45-4, at 22. However, in emails to Poly Expert, Willow Ridge discussed testing specifically related to Canada and Georgia. *Id.* at 22–23; *see also* ECF No. 45, Ex. 8. In addition, Willow Ridge described the conditions under which its additive was

tested by referencing South Florida. ECF. No. 45-6, at 7–8; ECF No. 45, Ex. 7.

In her deposition, Dennie agreed that in addition to explicitly knowing that Poly Expert's product would end up in Georgia and Canada, Willow Ridge had knowledge Poly Expert was making the mulch film for use somewhere within the United States "or around the World." ECF No. 45-3, at 30–31. However, Dennie denies that Willow Ridge specifically knew that Poly Expert's plastic mulch would be sold in Florida. *See id.* at 30.

### III

Personal jurisdiction comes in two forms—specific jurisdiction and general jurisdiction. Specific jurisdiction is present when a suit arises out of or relates to a defendant's contacts with the forum state. *See Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 318 (1945). General jurisdiction is present when a defendant's contacts with the forum state "justify suit against it on causes of action arising from dealings entirely distinct from those activities." *Id.* Here, the Farmers

and Poly Expert seek to base jurisdiction primarily on a specific jurisdiction theory. ECF. No. 46, at 18.[5]

To determine whether or not this Court has personal jurisdiction over Willow Ridge in this case, it is necessary to determine (1) whether the exercise of jurisdiction is appropriate under Florida's long-arm statute, and (2) whether exercising jurisdiction over Willow Ridge would violate the Due Process Clause of the Fourteenth Amendment. *Sloss Indus. Corp. v. Eirosol*, 488 F.3d 922, 925 (11th Cir. 2007). If both Florida law and the Constitution permit it, this Court may exercise jurisdiction over Willow Ridge. *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008).

This Court will conduct the Due Process analysis first. Because the exercise of personal jurisdiction over Willow Ridge does not comport with Due Process, there will be no need to conduct the analysis under Florida's long-arm statute.

---

[5] To the extent that the Farmers and Poly Expert claim that the exercise of personal jurisdiction is proper under a general jurisdiction theory, this argument fails under *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014). Under *Daimler*, a court usually lacks general jurisdiction over an entity unless it's incorporated in the state in which the court is located or has its principal place of business there. *Daimler AG*, 134 S. Ct. at 761. As previously noted, Willow Ridge is incorporated and has its principal place of business in Kentucky. ECF No. 32, at 2. And Willow Ridge's contacts with Florida are not so extensive that it is "essentially at home" here. *See Daimler*, 134 S. Ct. at 761.

A

Jurisdiction over a defendant is proper under the Due Process Clause if (1) the defendant has minimum contacts with Florida and (2) the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. *Eirosol*, 488 F.3d at 925.

1

The law of "minimum contacts" is murky. *See, e.g.*, *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070–71 (10th Cir. 2008); *see also* Linda Sandstrom Simard, *Meeting Expectations: Two Profiles for Specific Jurisdiction*, 38 Ind. L. Rev. 343 (2005). Trying to set down the "elements" of minimum contacts and apply them to a particular factual scenario is difficult. The more sensible course is to examine cases with facts similar to the facts of this case—specifically, cases involving parts or component manufacturers in jurisdiction A who sell their products to other entities in jurisdiction B who then sell faulty products that include / incorporate the parts or components to end-users in jurisdiction C. This sort of analysis is frankly necessary given the doctrinal incoherence infecting minimum contacts. *See Dudnikov*, 514 F.3d at 1071 (noting that because minimum contacts jurisprudence is unclear

and difficult to describe in the abstract, "courts have often re-treated to analogizing individual cases to discrete Supreme Court personal jurisdiction precedents").

One such case is the seminal *Asahi*. In *Asahi*, the Supreme Court ruled that a California state court did not have personal ju-risdiction over a Japanese manufacturer (Asahi) whose tire valve assemblies had allegedly caused a motorcycle accident in Califor-nia. *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano Cty.*, 480 U.S. 102, 105–06 (1987). Asahi had sold its tire valve as-semblies to a Taiwanese manufacturer, which then incorporated the tire valve assemblies into finished tire tubes which it sold throughout the United States, including California. *Id.* The evi-dence showed that Asahi was possibly *aware* that its tire valve as-semblies would end up in California, but that it didn't directly sell or market its products in California or otherwise have any direct contacts with California. *Id.* at 106–13.

Four justices agreed that Asahi lacked "minimum contacts" with California because it had not taken any action "purposefully directed towards" California. *Id.* at 112–13 (plurality opinion). The core of these justices' conclusion was as follows:

11

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

*Id.* at 112. The plurality's test for minimum contacts is sometimes called the "stream-of-commerce-plus" test. *See, e.g.*, *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1548 (11th Cir. 1993).[6]

---

[6] Four justices disagreed with the plurality's test, and would have found that Asahi had minimum contacts with California on the basis of its "regular and extensive sales of component parts to a manufacturer it knew was making regular sales of the final product in California." *Asahi*, 480 U.S. at 121 (opinion of Brennan, J.). To these four justices, "[a]s long as a participant in th[e] [market] is aware that the final product is being marketed in the forum State," personal jurisdiction is proper. *Id.* at 117. Justice Stevens refused to pick a "minimum contacts" test. *See id.* at 122 (opinion of Stevens, J.).

For many years, it was unclear whether the plurality's test should control minimum contacts analyses, and the circuits (and state courts) took various approaches. *See* Simona Grossi, *Personal Jurisdiction: A Doctrinal Labyrinth With No Exit*, 47 Akron L. Rev. 617, 647–50 (2014). The Supreme Court tried but failed to bring clarity to the field in 2011. *See J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011). Personal jurisdiction—and minimum contacts in particular—remains a mess. *See, e.g.*, Allan Ides, *Foreword: A Critical Appraisal of the Supreme Court's Decision in* J. McIntyre Machinery, Ltd. v. Nicastro, 45 Loy. L.A. L. Rev. 341 (2012).

Whether the plurality's test is the correct test in the Eleventh Circuit is unclear. *See Johnson v. Chrysler Canada Inc.*, 24 F. Supp. 3d 1118, 1135–38

Consider now two post-*Asahi* cases involving facts somewhat similar to the facts of this case that arrived at different conclusions based on subtle—but important—factual distinctions. First, in *Falkirk Mining*, the Eighth Circuit considered whether a foreign manufacturer of six custom "eccentric cams" used in mining equipment had minimum contacts with North Dakota. *Falkirk Min. Co. v. Japan Steel Works, Ltd.*, 906 F.2d 369, 371 (8th Cir. 1990). The chain leading from the defendant cam manufacturer to the plaintiff mining company was fairly long: the mining company's parent company contracted with an American manufacturer to make a walking dragline crane for use in the mining company's North Dakota operations; the American manufacturer contracted with a Japanese trading company to buy the cams; and the Japanese trading company contracted with the Japanese cam manufacturer to make the cams. *Id.* The American manufacturer—which assembled the dragline crane whose malfunction occasioned the lawsuit—played an active role in the design and manufacture of the cams, but the mining company did not. *See id.* at 375.

---

(N.D. Ala. 2014). But regardless of what the "right" test is, this Court is confident that a correct result can be arrived at by comparing the facts of this case to *Asahi* other similar cases.

The Eighth Circuit concluded that the case was analogous to *Asahi*, and that the exercise of personal jurisdiction over the Japanese manufacturer by a court in North Dakota would offend Due Process. *Id.* at 375–76. The court noted that the "company [lacks] an office, agents, employees, or property in the state. Like the manufacturer in *Asahi*, [the] company [doesn't] advertise[] or otherwise solicit[] business in North Dakota. Like *Asahi*, [the] company [didn't] create[], control[], or employ[] the distribution system that brought the cams to North Dakota. . . . [The company] manufactured the cams for purchase by [the Japanese trading company] in accordance with specifications provided by [the American crane manufacturer]. There is no evidence that [the company] knew it was manufacturing the cams for ultimate installation in a dragline in North Dakota. For all [the company] knew, [the American manufacturer] could have installed the cams into draglines at any number of locations in the United States or abroad" *Id.* at 375.

But now consider *Vandelune v. 4B Elevator Components Unlimited*, 148 F.3d 943 (8th Cir. 1998), decided by the same court that decided *Falkirk Mining.* In *Vandelune*, the plaintiff alleged that he was seriously injured when the defendant's safety moni-

14

toring device malfunctioned. 148 F.3d at 945. The defendant manufactured the device in England, and it had arrived at the plaintiff's workplace in Iowa through a path as tortuous as that traveled by the eccentric cams in *Falkirk*: the defendant "sold the [device] in question to Braime Elevator Components, Ltd., of Leeds, England. Braime sold the [device] to 4B, a Braime affiliate located in Peoria, Illinois. . . . 4B sold the [device] to Keith's Complete Service . . . of Boone, Iowa. Keith's sold the [device] to" the plaintiff's employer. *Id.*

The court reached a different conclusion than the *Falkirk Mining* court for a few reasons.[7] First, the court noted that the defendant had "designed the [device] for United States markets, particularly the substantial grain elevator market." *Id.* at 948. Second, the defendant had agreed to allow the Illinois-based 4B to distribute its products in the United States. *Id.* The defendant's employees had "attended technical support meetings at 4B's facilities," and many of the devices distributed through 4B ended up in

---

[7] The *Vandelune* court did not apply the stream-of-commerce-plus test, but rather performed a "more fact intensive analysis" with *Asahi* and other precedents as guides, much as this Court is doing. *Vandelune*, 148 F.3d at 947–48.

Iowa. *Id.* The court characterized this activity as a "foreign manu-facturer pour[ing] its products into a regional distributor with the expectation that the distributor will penetrate a discrete, multi-State trade area," and reaffirmed a prior holding that such activity amounts to the purposeful availment of the laws of those states. *See id.* (citing *Barone v. Rich Bros. Interstate Display Fireworks Co.*, 25 F.3d 610, 615 (8th Cir. 1994)).

This case falls somewhere between *Asahi/Falkirk Mining* and *Vandelune*. Like the manufacturers in all of these cases, Willow Ridge has designed its product to be used in specific applica-tions. But the ties between Willow Ridge and Florida are more ten-uous than the ties between the defendant and the forum state in *Vandelune*. Willow Ridge has not poured its products into a re-gional distributor that serves Florida,[8] and certainly the particular defective products at issue in this case did not arrive in Florida through such a path. True, Willow Ridge has had a long-term re-lationship with Poly Expert, and it has sold products to Poly Ex-pert knowing they would end up in integrated into a product used

---

[8] The evidence in the record suggests that someone in Florida who wanted to buy Willow Ridge's products would buy them from Willow Ridge di-rectly. It's not entirely clear, but it appears that Colors for Plastics, which serves as a distributor for Willow Ridge, does not serve Florida.

in a state that borders Florida. But unlike the defendant in *Van-delune*, Willow Ridge hasn't designed its products for applications in a particular state and then taken steps to have its product distributed in states near that state.

Poly Expert and the Farmers argue otherwise, claiming that Willow Ridge tested its additives under a "South Florida standard" and thus effectively designed its product for Florida. There's less than meets the eye to this argument. Looking at the actual e-mails sent by Willow Ridge to Poly Expert, it's apparent that Willow Ridge didn't really test its products using a "South Florida standard," contrary to the Farmers' and Poly Expert's characterization. Rather, Willow Ridge referenced South Florida in describing how much UV radiation the product had been exposed to in testing:

Dear Mr. Paterson

Here in pdf format are the degradation curves for the six filmed materials tested under Photo-Degradation conditions. A rule of thumb is that 300 light hours UV = 1 year out-door exposure in South Florida. Note, this is only "Rule of Thumb". If you have any questions please contact us.

Regards

Thomas J. Murphy - WILLOW RIDGE PLASTICS, INC.

ECF No. 47-4, at 2. The best reading of this e-mail is that Florida is mentioned not because Willow Ridge "had Florida in mind" when designing its products, but because it's a go-to reference for "sunny place."

In discussing the testing procedure (and this e-mail) at her deposition, Nadina Dennie stated that "the [testing] oven mimics—it's a UV oven and it mimics with humidity and heat that of south—it would be like South Florida, maybe Southern California, I'm not sure, type atmosphere." ECF No, 45-6, at 155. Of course, Southern California and South Florida have very different climates in terms of humidity, but they're both relatively sunny and relatively hot. The fact that Dennie would mention both of these places confirms that Florida is mentioned in the e-mail merely as a point of reference, not as an indication of a place where Willow Ridge expected or wanted Poly Expert to use its product.

Now consider the issue of advertising and marketing. In *Falkirk Mining*, part of the reason the court found that there was no personal jurisdiction was that the component manufacturer didn't advertise or solicit business in the forum state. Poly Expert argues that Willow Ridge "holds itself as a worldwide seller of a component product" on its website, and that it should therefore be subject to jurisdiction "anywhere its products . . . cause damage." ECF No. 47, at 11.

Putting aside for a moment the fact that there's no nexus between Willow Ridge's advertising on its website and the Farmers' use of Willow Ridge's product in Florida, this argument fails. Courts have consistently rejected the idea that where, as here, a seller of goods uses a website to advertising its wares to the world, the accessing of that website by someone in a state subjects the seller to personal jurisdiction in that state. *See, e.g.*, *Butler v. Beer Across America*, 83 F. Supp. 2d 1261, 1267–68 (N.D. Ala. 2000) ("jurisdiction is improper, however, when the nonresident defendant has established a passive Internet site, which acts as little more than an electronic billboard for the posting of information"). Even when an advertisement on a website prompts someone to order a product from a seller and the product then causes harm in the buyer's state, courts are reluctant to find personal jurisdiction based on that sale absent some additional actions directed at the state by the seller. *See Summit Auto Sales, Inc. v. Draco, Inc.*, Case No. 2:15cv00736, 2016 WL 706011, at *10 (N.D. Ala. Feb. 23, 2016) (existence of "phone calls, . . . pictures sent through OneDrive, and the representations made during these communications were inducements to buy directed at the Alabama resident that were not

present in . . . *Butler*," and therefore exercise of personal jurisdiction was proper).[9]

As for Willow Ridge's business dealings with the two Florida customers (one of whom is really a broker for a Venezuelan distributor), these dealings have nothing to do with this case—in fact, neither customer actually uses Willow Ridge's products in Florida. The Farmers' injuries don't in any sense "arise out of" these dealings, and so these contacts have little, if any weight, in the minimum contacts analysis. *See Dudnikov*, 514 F.3d at 1078–79 (discussing different tests for determining whether a cause of action "arises out of" contacts); *see also Vermeulen*, 985 F.2d at 1546 (noting that "the contacts must be related to the plaintiff's cause of action or have given rise to it" to count).

2

One final argument advanced by Poly Expert is that a more lenient "stream-of-commerce" test should be applied, and that, under that test, Willow Ridge has minimum contacts with Florida. ECF No. 47, at 12–13. As support for this position, Poly Expert

---

[9] Under the logic of *Summit Auto Sales*, Willow Ridge's communications and history of business with Poly Expert might subject it to suit in Canada (were Canada a state) in a suit brought by Poly Expert, and indeed that seems right.

cites to the Middle District of Florida's decision in *Hatton*. The court there held that "the 'stream of commerce' test remains good law in the Eleventh Circuit" because of the Supreme Court's fractured decision in *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011). *Hatton*, 937 F. Supp. 2d at 1366. Semantically, this may be true—Justice Breyer's opinion concurring in the judgment in *Nicastro* characterized the state of the law of minimum contacts as allowing for personal jurisdiction based on a stream-of-commerce theory when the stream represents the "regular flow" or "regular course" of sales. *See Nicastro*, 564 U.S. at 888–89 (Breyer, J., concurring in the judgment). So it is true that at least five members[10] of the current Supreme Court would probably find minimum contacts where a *high-volume* seller put its products into the stream of commerce knowing those products would end up in the forum state, even if that seller had no other contacts with the forum state.

But the Farmers and Poly Expert have not demonstrated that Willow Ridge is such a seller *as to Florida*—there is no evi-

---

[10] The three dissenters in *Nicastro* plus Justices Breyer and Alito.

dence of a true "stream" of commerce carrying Willow Ridge's additives to Florida. It is clear to this Court that under *Nicastro*, foreseeability alone is not enough to satisfy the demands of Due Process, at least when a seller only rarely conducts business in the forum state. In other words, assuming that the stream-of-commerce test remains good law, *Nicastro* makes clear that a cause of action must arise out of a true *stream*, and not an eddy, in order to support the exercise of personal jurisdiction.[11] *Id.* at 889.

Furthermore, even applying a more relaxed stream-of-commerce test, the Farmers and Poly Expert have not shown that Willow Ridge sold its products to Poly Expert with the expectation or knowledge that those products would end up incorporated into mulch that would be sold in Florida. So even assuming that the most lenient version of a minimum contacts theory should be used,

---

[11] That is to say, Justices Breyer and Alito, together with the *Nicastro* plurality, would likely not find the exercise of personal jurisdiction proper where, as here, (1) the cause of action arises out of an "eddy" and (2) there's no "plus."

This Court notes that some courts have declined to give *any* effect to Justice Breyer's opinion in *Nicastro*, opting instead to apply their circuits' pre-*Nicastro* case law. *See generally Allianz Global Corp. & Specialty Marine Ins. Co. v. Watts Regulator Co.*, 92 F. Supp. 3d 910, 915–17 (S.D. Iowa 2015) (discussing cases). This Court respectfully disagrees with that approach. When it's apparent that an opinion concurring in the judgment is "less far-reaching" than a plurality opinion, that concurring opinion controls. *See United States v. Robison*, 505 F.3d 1208, 1221 (11th Cir. 2007). In this case, "less far-reaching" means "less restrictive of personal jurisdiction," and so Justice Breyer's opinion controls. *Cf. id.*

Willow Ridge lacks minimum contacts with Florida. In terms of "discrete Supreme Court precedents," this case is too much like *World-Wide Volkswagen Corp. v. Woodson* for this Court to exercise personal jurisdiction over Willow Ridge. *See* 444 U.S. 286, 295 (1980) (no personal jurisdiction based on "one, isolated occurrence" in the forum state).

This is admittedly a close case. And it is probably time for a reevaluation of what "minimum contacts" means in a world of internet advertising and increased globalization. *Cf. id.* at 887 ("I do not doubt that there have been many recent changes in commerce and communication, many of which are not anticipated by our precedents."). But neither the Farmers nor Poly Expert has shown that the injuries to the Farmers' watermelon crops arise out of Willow Ridge's minimum contacts with Florida so as to allow for the exercise of personal jurisdiction over Willow Ridge.

### 1. Fair Play and Substantial Justice

Because the alleged injuries to the Farmers' watermelon crops do not arise out of any minimum contacts Willow Ridge has had with Florida, there is no need to analyze whether the exercise

of jurisdiction over Willow Ridge would comport with "fair play and substantial justice."

IV

Even considering the evidence in the record in the light most favorable to Poly Expert and the Farmers, this Court cannot conclude that the alleged injuries to the watermelon crops arose out of any minimum contacts that Willow Ridge has had with the state of Florida. There is no evidence of a stream of commerce carrying Willow Ridge's products into Florida, nor is there evidence that Willow Ridge otherwise purposefully availed itself of the protections of the laws of Florida in connection with its sale of additives to Poly Expert so as to subject itself to suit in this state for accidents caused by those additives. Rather, it appears from the record that the additives used in Poly Expert's mulch ended up in Florida due to an eddy, rather than a stream, of commerce.

For these reasons,

**IT IS ORDERED:**

1.  Willow Ridge's motions to dismiss, ECF Nos. 32 & 40, are
    **GRANTED.**

2.  Count IV of Plaintiff's Second Amended Complaint, ECF No. 61, is **DISMISSED without prejudice** for lack of personal jurisdiction.

3.  Defendant Poly Expert, Inc.'s third-party complaint and cross-claim against Willow Ridge are **DISMISSED without prejudice** for lack of personal jurisdiction.

4.  This Court finds that there is no just reason for delaying entry of judgment in favor of Willow Ridge. This case can proceed between Plaintiffs and Defendant Poly Expert. Therefore, the Clerk shall enter judgment stating: "Count IV of Plaintiff's Second Amended Complaint, ECF No. 61, is DISMISSED without prejudice for lack of personal jurisdiction. Defendant Poly Expert, Inc.'s third-party complaint and cross-claim against Willow Ridge Plastics, Inc. are DISMISSED without prejudice."

5.  The Clerk shall set a telephonic status conference for the week of May 16, 2016 so that the discovery and pre-trial deadlines can be re-set.

**SO ORDERED on May 16, 2016.**

**s/Mark E. Walker** ____
**United States District Judge**
